

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 0 1 2011

JAMES W. McCORMACK, CLERK

By:_____
DEP CLERK

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

UNITED COALITION OF REASON INC.,                    **PLAINTIFF**
a Delaware corporation,

v.                        No. **4 · 11 - C V - 0 4 5 0 Jmm**

**CENTRAL ARKANSAS TRANSIT
AUTHORITY**, an Arkansas public corporation,
and **ON THE MOVE ADVERTISING, INC.**,
an Arkansas corporation                              **DEFENDANTS**

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### Introduction

Plaintiff, the United Coalition of Reason ("UnitedCoR")[1], brings this action to enforce its

constitutional rights to access to a designated public forum.

UnitedCoR moves for a preliminary injunction. The Court must consider four factors in

determining whether to grant a preliminary injunction. *Iowa Right to Life Committee, Inc. v.

Williams*, 187 F.3d 963, 966 (8th Cir. 1999); *Dataphase Sys. V. CL Sys., Inc.,* 640 F.2d 109, 114

(8th Cir. 1981). The factors are: (1) probability of success on the merits; (2) threat of irreparable

harm; (3) the balance between this harm and potential harm to others if relief is granted; and (4)

the public interest.  All four factors are demonstrated by the evidence attached to UnitedCoR's

motion.   The loss of First Amendment freedoms, even for a short time, constitutes irreparable

injury. *Phelps-Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir. 2008). Defendants have conspired to

restrict UnitedCoR's access to a designated public forum, or in the alternative, have refused

---

[1]UnitedCoR is referred to in many of the exhibits as "UCOR."  UnitedCoR uses the abbreviation
UnitedCoR to avoid confusion with other entities and acronyms.  To avoid confusion, wherever the
abbreviation UCOR was used to refer to the Plaintiff it has been replaced with the abbreviation
UnitedCoR.

UnitedCoR access to a nonpublic forum on the basis of the viewpoint of its message.   Under either theory, UnitedCoR has a high probability of success.

Defendant, Central Arkansas Transit Authority ("CATA"), is an Arkansas public corporation created pursuant to Ark. Code Ann §14-334-101 *et seq.* CATA is a public corporation performing public and governmental functions. Ark. Code Ann §14-334-104. CATA provides mass transit bus service to the public in parts of Pulaski County, Arkansas. To defray some of the cost of running the transportation service, CATA sells advertisements on its buses.

Public corporations providing transportation services and selling advertisement on buses, trains, and other means of public transportation have often been recognized as having created a designated public forum for freedom of speech. See *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir., 1998).

The Plaintiff, in good faith, entered into negotiations to purchase advertising (the form of which[2] is shown below) on city buses.  Plaintiff's advertisement would contain the following text: "Are you good without God?  Millions are."



---

[2]  The form of advertisement sent to the Defendants for approval was identical to that shown except that it included a different website address (from a previous advertising campaign in another city). This address was for the Plaintiff's affiliate in such city.  This was done because the artwork for the Plaintiff's campaign in Little Rock would only be completed when the Defendants had agreed to run the Plaintiff's advertisements.

Plaintiff, through its agent, Shaun Barbeau, of Media Brokers International, Inc., reached a preliminary understanding with Defendant On the Move Advertising, Inc. ("OTMA"), an agent of Defendant CATA. Exhibit A, p, 47.

On Monday, February 28, 2011, Barbeau forwarded the proposed advertisement copy to Lydia Robertson of OTMA. (Exhibit 1, FOIA request response, p. 46)   Robertson forwarded the proposed advertisement copy to CATA's Executive Director, Betty Wineland.

Defendant CATA, through its Executive Director, found the message of Plaintiff distasteful.   This is evident from the Executive Director's email, responding to Plaintiff's advertisement with the comment "I need Him now more than ever. Good grief. I think we need to throw religion into the advertising policy - as a negative. Stall while CATA reviews." (*Id*. at 45).   This email shows both CATA's unfavorable response to Plaintiff's message and requests that its agent, OTMA, cooperate with CATA to forestall the publication of Plaintiff's message.

On Tuesday, March 1, 2011, Robertson advised Barbeau that "the transit authority will accept the artwork, but there are caveats."   She then stated that she would impose additional requirements because of the content of the message. The additional requirements were allegedly to be required because UnitedCoR's message had inspired "some repercussions and vandalism in other markets."

Although Wineland advised that CATA would accept the advertisement, in fact documents later produced under the Arkansas Freedom of Information Act demonstrate that CATA never intended to accept UnitedCoR's advertisement, but rather hoped that its onerous and burdensome additional conditions would cause UnitedCoR to abandon the project.

The requirement of a deposit was out of the ordinary.   CATA had never required an advertiser to place a deposit before. (*Id*. at 52).   OTMA represented to UnitedCoR that OTMA

3

was legally responsible for any damage to the bus and graphics. This representation appeared in an email from Lydia Robertson of OTMA. (*Id.*). OTMA continued this ruse in several emails from its lawyer in which it repeated the representation.

Although the requirement of a deposit was unreasonable and unorthodox, UnitedCoR indicated its willingness to deposit $10,000 in order to go forward with the advertisement (*Id.* at 53). This was not because UnitedCoR believed that CATA had a legitimate right to discriminate against it because of the content of its message. This was done simply to get the contract into effect in sufficient time to allow production to commence so that the ads could appear on CATA buses starting May 9, 2011, allowing them to run well ahead of and through Little Rock's popular Riverfest and the Memorial Day weekend. That proposal was unacceptable to CATA.

On March 9, 2011, CATA and OTMA declined UnitedCoR's offer in a communication with Barbeau (*Id.* at 61). That afternoon, UnitedCoR's counsel contacted OTMA regarding the refusal by telephone and email (*Id.* at 59; 60).

On Thursday, March 10, 2011, Lydia Robertson prepared an email which was purportedly to be "strictly from On the Move" but which, in fact, she asked Betty Wineland and CATA's counsel to review.

That email was forwarded to Betty Wineland and her counsel. The subject line read "RE: Coalition - let On the Move take heat!" In her email to Betty Wineland, she stated: "Below is the note I would like to send. It is strictly from On the Move and in previous emails, I've written every word with an eye toward the very position they have taken. I am extremely conscious regarding the First Amendment and covering everyone while I do it. Please know I serve on a gubernatorial appointment to a State Agency, I am a Class A licensed private investigator and am not a stranger to court action. I am NOT an attorney, but I have never liked being bullied." Ms.

4

Robertson continued, "Why not let me take the heat for awhile? Leave CATA out of it; CATA can say On the Move responded on our own. See what Carolyn [CATA's counsel] thinks about the brief note below. Probably since he has contacted us, I don't need Shaun's permission to share the emails-that IS a question for Carolyn." (Id. at 53)

That email demonstrates that OTMA entered into a conspiracy with CATA to deprive UnitedCoR of access to advertising on CATA's buses. The deposit requirement was not made in good faith, but was a pretext.

The threat of vandalism is substantially overblown. (Exhibit F.) UnitedCoR has run advertising programs like this one in 36 markets (two of them twice). There have been four markets in which UnitedCoR has been informed of instances of vandalism. The only vandalism that involved a bus occurred in Detroit, Michigan. The only vandalism that impacted on the property owner's own property (as opposed to UnitedCoR's advertisement itself) was to a billboard in St. Augustine, Florida.

UnitedCoR and similar groups have operated in Arkansas before. There has been no difficulty with vandalism in Arkansas. The advertisements ran in Fayetteville, Arkansas without incident (see http://UnitedCoR.org/national/news/godless-ads-now-fayetteville-buses). The Central Arkansas Freethinkers have likewise displayed a billboard that read "Beware of Dogma" without incident. The Central Arkansas Freethinkers also displayed an informational kiosk on the Arkansas State Capitol grounds next to a crèche erected by a local Christian association. That informational kiosk has not been subjected to destructive vandalism. It is nothing more than speculation that local communities of believers are prone to lawlessness and even violence.

OTMA and CATA proposed a variety of unreasonable conditions designed to prevent UnitedCoR from placing its order with CATA. They deemed $10,000 insufficient to protect

5

CATA and—allegedly—OTMA. At one point they demanded a deposit of $36,000 and—as OTMA deemed that $36,000 would likely be insufficient—proof that UnitedCoR had assets sufficient to cover any destruction caused by vandals or terrorists. It was the Defendant's intent to require Plaintiff to indemnify it for any damage caused by persons who would protest Plaintiff's message.

UnitedCoR attempted in good faith to negotiate with OTMA and CATA. The email evidence shows that OTMA and CATA did not reciprocate. They were, instead, successful in preventing UnitedCoR from having its advertisements run during Riverfest, which was UnitedCoR's original goal. After much negotiation, UnitedCoR has been unable to secure a reasonable offer from OTMA and CATA. The reason that OTMA and CATA have refused UnitedCoR's business is that they are uncomfortable with UnitedCoR's message.

It should be noted that UnitedCoR has tried to resolve this dispute without resorting to the Court. Contrary to CATA's and OTMA's assertions that UnitedCoR simply wanted the publicity that would come from this lawsuit, the evidence shows that UnitedCoR would have preferred to simply be permitted to purchase advertising space without discrimination. UnitedCoR was even willing to agree to a discriminatory deposit requirement (in the amount of $10,000) at one point in the negotiations, even though the requirement of such a deposit is clearly unconstitutional viewpoint discrimination.

OTMA has taken the position that it is a private business, not subject to the First Amendment, when in fact it is an agent for a public entity. A number of communications from OTMA and its attorney were designed to mislead UnitedCoR as to the nature of its relationship with CATA. The evidence shows that CATA is so entangled with the conduct of OTMA that any actions of OTMA can be fairly attributed to the state. *Americans United for Separation of*

6

*Church & State v. Prison Fellowship Ministries, Inc.*, 509 F.3d 406, 422-23; (8th Cir., 2007); *Wickersham v. City of Columbia*, 597 F.3d 591, 597 (8th Cir., 2007).

The evidence produced under the Freedom of Information Act demonstrates that CATA and OTMA engaged in the decision-making process regarding UnitedCoR together. CATA cannot violate the constitutional rights of its customers by relying on a private company as camouflage for its activity.

## ARGUMENT

### I.     CATA is a public entity

Under the Arkansas statute that created it, Ark.Code Ann. §§ 14-334-101 *et seq.*, CATA is a public entity. *See also Salley v. Central Arkansas Transit Auth.*, 326 Ark. 804, 934 S.W.2d 510 (1996); *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 349 (6th Cir. 1998)

### II.     CATA has opened up a designated public forum for advertising

"The Supreme Court has adopted a forum analysis for use in determining whether a state-imposed restriction on [speech-related] access to public property is constitutionally permissible. In determining what property constitutes the relevant forum, courts focus on the access sought by the speaker. *Corneliuis v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 801 87 L.Ed.2d 567, 105 S.Ct 3439 (1985) and United *Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority,* 163 F.3d 341, 349 (6th Cir. 1998).

This issue has arisen in many cases involving public transit authorities. *E.g. Lehman v. Shaker Heights,* 418 U.S. 298 (1974); *AIDS Action Committee of Mass., Inc. v. Mass. Bay Transp. Auth.,* 42 F.3d 1, 7 (1st Cir. 1994); *Ridley v. Massachusetts Bay Transportation*

*Authority*, 390 F.3d 65 (1st Cir. 2004); *New York Magazine v. Metropolitan Transportation Authority*, 136 F.3d 123 (2d Cir. 1998); *Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transportation Authority*, 148 F.3d 242 (3rd Cir. 1998); *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998); *Planned Parenthood Assoc v. Chicago Transit Authority* (7th Cir. 1985); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972 (9th Cir., 1998); *Metro Display Advertising, Inc.*, 143 F.3d 1191 (9th Cir., 1997); *Metro Display Adver., Inc. v. City of Victorville,* 143 F.3d 1191 (9th Cir.1998); *Lebron v. Washington Metropolitan Area Transit Authority,* 749 F.2d 893 (D.C. Cir., 1984).

The Supreme Court has identified three different types of fora: traditional public fora, designated public fora, and nonpublic fora. *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006); *Ridley, supra,* at 76. The Eighth Circuit has explained that:

> [T]he Supreme Court uses a forum analysis for evaluating restrictions of speech on government property. *See id.* at 45-46, 103 S.Ct. 948. The forum analysis initially requires a court to determine whether a property is a traditional public forum, a designated public forum, or a nonpublic forum. *Families Achieving Independence & Respect v. Neb. Dep't of Soc. Servs.,* 111 F.3d 1408, 1418 (8th Cir.1997). Once a court makes a determination on the nature of the forum, it then applies the appropriate standard of scrutiny to decide whether a restriction on speech passes constitutional muster. *See, e.g., Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677-683, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (hereinafter "Forbes"); *United States v. Kokinda,* 497 U.S. 720, 726-27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Thus, the extent to which access to, and the character of speech upon, government property may be limited depends upon the nature of the forum in which the speech takes place. *Burnham v. Ianni,* 119 F.3d 668, 675 (8th Cir.1997).

*Bowman, supra,* at 974-75.

Traditional public fora are places like streets, parks, and sidewalks. The advertising space on and around public transportation is not a traditional public forum.

8

As the Eighth Circuit observed in *Bowman, supra*, the jurisprudence on what constitutes a designated forum and what constitutes a "limited" or "nonpublic" forum is far from lucid. *Id.* at 975. *See also AIDS Action, supra,* at p. 10 (describing the "relatively murky status of the public forum doctrine"). The Courts have answered the question whether advertising space on public transportation or on bus stops or subway stations is a designated public forum in almost every way possible. **Yes.** *Food and Commercial Workers, supra; Planned Parenthood, supra; Christ's Bride, supra; Lebron, supra; New York Magazine, supra.* **No.** *Children of the Rosary, supra; Ridley, supra.* **Arguably.** *Victorville, supra.* **We do not know but it does not matter.** *Aids Action, supra.* Whether particular advertising space will be considered a designated public forum or a nonpublic forum depends on the circumstances of the case.

In *Lehman v. Shaker Heights, supra,* the United States Supreme Court, in a decision that predates the modern forum doctrine it announced in *Perry Educ. Ass'n v. Perry Local Educators' Assn*, 460 U.S. 37 (1983), found that the City of Shaker Heights could enforce a long-standing policy of not selling advertising to a candidate for political office. The City had a content neutral policy under which it would not accept political advertising, and it had never done so. The decision was a plurality decision, with four justices finding that the restriction was permissible because "the city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." *Id.* at 304. Justice Douglas concurred primarily on the strength of the last rationale, "the risk of imposing upon a captive audience." Four justices dissented.

"While *Lehman* stands for the proposition that the interior of a transit system's cars and buses is not a traditional public forum, it does not stand for the proposition that such space may never become a public forum." *Planned Parenthood, supra* at 1233. In appropriate

9

circumstances courts have found that advertising space on a transit system's property is a public forum.

The courts look to the actual use of the forum and the government regulations regarding the use of the forum. Where the government has made the property generally available to a class of speakers, that fact militates in favor of a finding of a designated public forum. *Food and Commercial Workers, supra,* at 352.

One of the factors that militates against creation of a designated public forum is the existence of a content neutral written policy. *See Children of the Rosary, supra*, at 978. As the cases cited above show, when a public transportation system adopts a viewpoint neutral policy governing its advertising, the question whether it has created a public forum will depend on the nature of the policy. In the absence of such a policy, as here, where there is no written policy, the public transportation system cannot defend its decision as being in compliance with such a policy.

It is impossible to discuss the policy in this case because there apparently is not one. Exhibit B. Under the contract between OTMA and CATA, "The Authority reserves the right to approve all copy, displays, graphics, data, and advertising which Advertiser proposes to locate on the Demised Space prior to same being actually affixed, situated, or place don [sic] the Demised Space." Exhibit D, Paragraph 7. There are no standards, and Exhibit A demonstrates that the only standard is the subjective determination of the Executive Director of CATA. Of course, a policy that grants unfettered and unguided discretion to a public official on matters related to expression cannot pass constitutional muster. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988).

10

The Authority has made the advertising space on its buses a "designated" public forum. Courts "infer an intent to designate property a public forum where the government makes the property 'generally available' to a class of speakers." *United Food & Commercial Workers' Union, supra,* at 350.

The Eighth Circuit went on to explain the legal significance of a finding that a particular forum is a designated public forum or a nonpublic forum. *Bowman v. White,* 444 F.3d 967 (8th Cir. 2006):

> The distinction between a limited designated public forum and an unlimited designated public forum is significant because it controls the level of scrutiny given to restrictions on speech. Like the government's ability to restrict speech in a traditional public forum, the government's ability to restrict speech in an unlimited designated public forum is sharply circumscribed. *Perry, 460 U.S. at 45.* In an unlimited designated public forum, the government may enforce a content-neutral time, place, and manner restriction only if the restriction is necessary to serve a significant government interest and is narrowly drawn to achieve that interest. *Perry, 460 U.S. at 46.* In contrast, in a limited designated public forum, "restrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral." *Turner, 378 F.3d at 143.*

Id. at 976.

The evidence here shows that CATA, rather than limit the use of its advertising space solely to purely commercial speech, has made its space available generally to the public, to churches, to politicians, and to public interest groups, subject only to the preferences of the Executive Director. As such, CATA in fact has no express policy excluding any topic of speech from its advertising space. It has created a designated public forum. Restrictions on speech in a public forum are subject to strict scrutiny. *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 US 37 (1983) (stating that "a content-based prohibition [in a designated public forum] must be narrowly drawn to effectuate a compelling state interest"). However, that may not be important in this case, because regardless of the standard, it is apparent from the disclosures contained in

the Freedom of Information request, CATA engaged in impermissible viewpoint discrimination. Further, its agent's email of March 1, 2011 essentially admits the viewpoint based discrimination: "Because On the Move Advertising, Inc., is responsible for any damage/vandalism done to the buses or signage **due to its message**, we are placing this order in a special category." Exhibit A, p. 47 [emphasis added].

**III.  Regardless of the whether the advertising space on CATA's buses is a designated public forum or a nonpublic forum, CATA's refusal to permit UnitedCoR to purchase its proposed advertisement is an unconstitutional violation of the state's obligation to be neutral as to the viewpoint expressed in granting or withholding access.**

When courts determine that a particular public transit system has not opened a public forum, their work is not done. It must still be determined whether the governmental agency was unreasonable or discriminated on the basis of viewpoint in making a decision to exclude the plaintiff's speech. "Although the [public transit company] advertising program is neither a traditional public forum nor a designated public forum, regulations are still unconstitutional under the First Amendment if the distinctions drawn are viewpoint based or if they are unreasonable in light of the purposes served by the forum." *Ridley v. Massachusetts Bay Transportation Authority,* 390 F.3d 65, 82 (2004).

Government restrictions or burdens on speech imposed because the government views such speech as controversial are inherently tied to the viewpoint expressed, and therefore amount to unconstitutional viewpoint discrimination. *United Food & Commercial Workers' Union, supra,* at 361 (stating that "any prohibition against 'controversial' advertisements unquestionably allows for viewpoint discrimination").

Whether the standard is the higher one of a "designated public forum" or the lesser one of a nonpublic forum, CATA's refusal to grant access to its advertising space on the same terms that every other advertiser is granted fails both requirements for denial of access to a nonpublic forum. It is unreasonable and it fails the "viewpoint neutral" test.

## IV.  CATA has no policy, legitimate or otherwise, that would prohibit the sale of the advertisement UnitedCoR proposes to purchase.

This case differs from many of the cases cited in the previous section in that there was no written policy governing the sale of advertisements. *But see, Planned Parenthood, supra* at 1233 ("we are confronted with no policy at all"). Likewise, CATA cannot invoke any historical refusal to accept either political ads or ads of a religious nature, as it has accepted both. (Exhibit A, p. 53). CATA has, through its agent, conceded that they are not aware of any written policy. (Exhibit B). Acceptance or rejection of advertisements is at the sole, unguided discretion of the Executive Director of CATA.

## V.  It is unconstitutional for a public entity to enforce a "heckler's veto" by restricting access to public forum by charging a premium in the case of a controversial political message because of alleged expense. *Forsyth County, Georgia v. The Nationalist Movement,* 505 U.S. 123 (1992).

Under either standard, a governmental agency cannot discriminate on the basis of the viewpoint expressed in the message. One consequence of this is that the state may not charge a premium in the case of a controversial message delivered before a hostile audience. *Forsyth County v. The Nationalist Movement,* 505 U.S. 123, 136 (1992) (stating that "[s]peech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob") and *Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515,

13

1525 (11th Cir. 1985) (stating that "charg[ing] more for speech which is unpopular or controversial, in the mind of a public official . . . does not comport with the First Amendment principle of equality of expression under the Constitution.").. In *The Nationalist Movement v. City of York*, 481 F. 3d 178 (3d Cir. 2007), the Third Circuit explained that any permit fee that varies with the content of the proposed speech is unconstitutional. Any requirement that the speaker indemnify the government for any expenses brought about by its speech by third parties is likewise unconstitutional.

**VII.   OTMA's actions are fairly attributable to the State, even though has held itself out as a private corporation in order to attempt to shield CATA from its responsibility to abide by the Constitution. Documents produced through the Freedom of Information Act show that OTMA and CATA conspired to mislead Plaintiffs as to its role.**

The Freedom of Information request (Exhibit A) establishes that there was a close nexus between CATA and OTMA in denying UnitedCoR access to the advertising space. The question is whether the conduct at issue--here the action of denying access to advertising space by imposing unreasonable restrictions based on the content of the message--is fairly attributable to the state. *Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007). As in *Wickersham*, the power that OTMA had to deny access to the advertising space derives from authority granted to it by CATA.

OTMA and CATA were both willful participants in joint activity and there is "pervasive entwinement" between OTMA and CATA. *Wickersham, supra*, at 597 quoting from *Adickes v. S.H.Kress & Co*, 398 U.S. 144 (1970) and *Brentwood Acad. v. Tenn Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 291 (2001).

CATA played an active role in approving advertisements based on content. Exhibit A. An example is the Direct General advertisement, in which CATA was active in negotiating the acceptable language of the advertisement (*Id.* 21-32).

Another way in which CATA and OTMA were entwined was the conspiracy between them to mislead UnitedCoR. CATA's role was clearly more than approving the content of the ad. The string of emails between OTMA and CATA show both parties' intent to pass off CATA's reluctance to accept UnitedCoR's business as OTMA's reluctance and not any action of CATA. On February 28, 2011, at 1:58 p.m. Shaun Barbeau, as agent for UnitedCoR, forwarded UnitedCoR's proposed advertisement to Lydia Robertson of OTMA. (Exhibit A, p. 46). At 2:04 p.m. Lydia Robertson forwarded that ad copy to Betty Wineland with the message, "Dear God......HELP!" *Id.* pp. 45-46. At 2:23 p.m. Wineland replied, "I need Him now more than ever. Good grief. I think we need to throw religion into the advertising policy—as a negative. Stall while CATA reviews."

The next morning, Robertson informed Wineland that the Christian Science Church of North Little Rock had inquired about advertising space at the same time. "Makes me wonder if it's the same, or an opposing message that would help balance the other message?" *Id.* at 45. Later that day, Wineland wrote Shaun Barbeau agreeing to accept the artwork with "caveats." Wineland informed Barbeau that she would require a refundable security deposit in advance. In the event of any vandalism, the money would be used to replace the signs (or UnitedCoR could send replacements if that works better) and repair any damage to the bus. *Id.* at 47. In other words, UnitedCoR would be required to take responsibility for any vandalism committed by persons who disagreed with its message.

On March 3, 2011, Barbeau asked Robertson about the "rather unorthodox request of a 'security deposit'" and whether such a deposit had ever been required of any other client. *Id.* at 52. Robertson replied, "I have never before required such a deposit, but as I am responsible for damages to the bus and graphics, and since the campaign you forwarded art on has evidently caused vandalism in other markets, On the Move Advertising, Inc., is only charging the security deposit to insure we don't end up with charges we have to eat." *Id.*

The emails provided by CATA do not reflect any additional activity until March 8, 2011, at which time Ashley Foshee of OTMA forwarded some websites about "vandalism." She volunteered to continue her investigation. *Id.* at 57. There is also a cryptic email from Robinson to Wineland "Betty, I hope you read in my careful email." Exhibit A, p. 57.

The next day, both CATA and OTMA decided to decline the offer. *Id.* at 61. UnitedCoR responded with correspondence from Bill Burgess, UnitedCoR's counsel.

On March 10, 2011, Robertson sent Wineland an email entitled "Coalition—Let on the Move take heat!" The email, found on page 53 of Exhibit A, speaks for itself.

OTMA proposed to pretend that the response was solely OTMA's response, made on its own. "Why not let me take the heat for awhile? Leave CATA out of it; **CATA can say** On the Move responded on our own." *Id.* [emphasis added].

The email reflects that Shaun Barbeau wrote OTMA and said that UnitedCoR would deposit $10,000. Robertson stated that it would cost about $2,000 per side if a CATA bus had to be repainted and re-decaled. Eighteen signs times $2,000 came to $36,000. Robertson's estimate assumed that vandals would damage not only every single sign on every bus, but would damage the paint and the decals on every single bus as well.

In the email, Robertson conceded that CATA had accepted a political advertisement and some advertisements from churches.

It is difficult to read Robertson's email as anything less than an attempt to mislead UnitedCoR into believing that OTMA, on its own, refused to accept the advertisement because of its contractual liability to indemnify CATA for damage done to the buses by vandals who did not agree with UnitedCoR's message that one could be good without God. The conspiracy continued when OTMA, through its counsel, represented that, "CATA did not exercise its right of refusal under the agreement between CATA and OTMA; thus the decision to accept or reject [UnitedCoR]'s advertising rests solely with my client, On the Move Advertising ("OTMA") and no longer involves CATA. CATA's counsel also re-confirmed CATA's position is, as it has been for the duration of the CATA/OTMA relationship, that OTMA is responsible for all damages to CATA's property resulting, directly or indirectly, from any advertising activites OTMA allows or directs on CATA's property, without regard to the name of the advertiser, advertised belief, product or service, or whether CATA failed to exercise its right of refusal under the CATA/OTMA agreement." Exhibit B.

Stuart's email further suggests that among the risks of an advertisement such as UnitedCoR's was the risk of "someone possibly committing a terroristic act, such as tossing a Molotov Cocktail at the [UnitedCoR] advertisement on the side of a CATA bus loaded with passengers." Exhibit B.

In an email dated March 23, 2011, Stuart took the position that OTMA was not an agent of CATA, that CATA's only involvement with advertising decisions is a final right of approval or disapproval, which in the present case was never reached because OTMA rejected the advertisement for legitimate business reasons.

17

In an April 18, 2011, email, Stuart represented that OTMA leased all of the advertising space on the buses and owns the right to the advertising space during the period of the lease. OTMA is free to do whatever it wants to do with the space, including leaving it blank if it so desires. "CATA has exclusively leased all of the advertising space on its buses to OTMA for a fixed term."

The problem with these representations is that they are simply not true, as shown by the disclosures CATA was forced to make under the Freedom of Information Act.

CATA originally produced 80 pages of documents, which pages are attached to the motion in their entirety as Exhibit A. The Plaintiff asked for the contract between CATA and OTMA but was originally told that the contract could not be located.

On May 9, 2011, after the disclosures under the Freedom of Information Act disclosed at least part of the communications between OTMA and CATA, UnitedCoR's attorney Bill Burgess wrote and asked once again that UnitedCoR be allowed to purchase advertising. Burgess pointed out that the actual contract between OTMA and CATA had not been produced.

On May 12, 2011, the actual contract between OTMA and CATA apparently surfaced. It was provided to Gerry Schulze by email that same day at 11:53 a.m. Also that day CATA's attorney replied with a letter. CATA's attorney took the position that CATA never rejected the requested advertisements and that "CATA was made aware of the history of terrorism that follows the intentionally inflammatory advertisements sought to be placed by the United Coalition of Reason ([UnitedCoR]) and therefore, reminded OTMA that OTMA is, and always has been responsible for damages to CATA's property resulting from terrorism or vandalism. OTMA, on its own, requested indemnity and a deposit from [UnitedCoR], a reasonable request under the circumstances." Exhibit E.

18

CATA's attorney nevertheless expressed a willingness to work toward a solution. UnitedCoR agreed to resume negotiations.

OTMA's attorney followed up with a proposal that was as unreasonable as the ones that had been made before. This was also, likewise, designed to give UnitedCoR no choice but to reject the offer.

The proposed contract differs in material respects from the contract OTMA and CATA ordinarily supply to advertisers. Exhibit A (pages 2-3). OTMA removed the references to OTMA as CATA's "agent" from Sections 1 and 2. It added an entirely new provision to Section 1 permitting OTMA to immediately terminate the ad run and remove all of UnitedCoR's ads if "any damage whatsoever" that is not accidental in cause occurs to even a single sign. It added an entirely new Section 2, requiring that CATA and OTMA be additional named insured entities on an insurance policy with a coverage limit no less than $1 million per occurrence and $3 million in the aggregate that covers "contracted liability [such as the new indemnity in Section 3 described below], hired vehicles, advertising liability, and acts of vandalism and terrorism." It changed the indemnity provision in Section 3. In OTMA's standard contract that provision provides that OTMA was not liable for a variety of damage/losses to people or property unless due to OTMA's gross negligence. The proposed contract inserts a new additional clause in this provision providing that UnitedCoR must indemnify and hold harmless OTMA for such losses (and adding to the list "acts of terrorism, acts of public enemies and other causes"). The events giving rise to liability are not even limited to those connected to the advertisement but requires UnitedCoR to sign an indemnity agreement against "all damage or loss . . . caused by . . . [any] other persons . . . and other causes." The proposed contract changed the provision in Section 4 that governs repair of advertising damaged by third parties; the standard contract provides that

OTMA's agent "will assume responsibility for repair" and the proposed contract provides that OTMA's agent "will perform repairs and [UnitedCoR] shall immediately pay all of [OTMA's] invoices related thereto" if the thrid party's conduct "is reasonably related to or incited by [UnitedCoR's] advertising."

This position is unreasonable in numerous respects. To impose on UnitedCoR's speech the burden of its opponents' perceived unlawful characteristics violates UnitedCoR's constitutional rights. *Forsyth County v. The Nationalist Movement*, 505 U.S. 123, 136 (1992); *The Nationalist Movement v. City of York*, 481 F.3d 178 (3d Cir. 2007). Nothing but speculation indicates that the damage from any vandalism would extend beyond the signs themselves.

Most importantly, there is evidence that such a requirement has never been imposed on any other customer. Exhibit A, p. 52.

CATA's position in its lawyer's letter of May 12 was likewise unreasonable. The message "Are you good without God? Millions are," simply is not inflammatory. It is aimed at nonbelievers who think they are alone in their nonbelief.

The contract belatedly provided simply does not make OTMA responsible for any damages to CATA's property resulting from terrorism or vandalism. No such provision appears in the contract. Instead, the contract provides that CATA "will not be liable for any personal injury, damage, or loss to person or property caused by [OTMA], other persons, theft, burglary, assault, vandalism, any criminal act, fire, flood, water leaks, rain, hail, ice, snow, explosions, interruption of service, acts of God or other causes; unless same is due to the negligence of [CATA] . . . " Exhibit D, paragraph 5. Paragraph 11 requires OTMA to indemnify CATA from claims which may be incurred, but that provision is clearly directed at litigation and not damage caused by vandals or terrorists.

20

Against the possibility that another agreement between CATA and OTMA should surface, it should be noted that the agreement contains all the terms and conditions agreed upon by the parties. Paragraph 12 (c).

This position is also unreasonable because the fears of vandalism or terrorism are substantially overblown. It is true that a few of UnitedCoR's advertisements have attracted the attention of vandals. UnitedCoR makes no secret of this, but freely reports such incidents on the web pages of its various affiliate groups. http://www.UnitedCoR.org

As of March 9, 2011, UnitedCoR had run campaigns in 36 markets, two of them twice, and vandalism had only occurred in four. Exhibit A, p. 61. Only once was there damage to the vendor's property, a billboard. Typical vandalism consists in changing the message on the sign to something more compatible with a believer's worldview. Exhibit F.

The threat of "terrorism" is completely overblown, unless of course "terrorism" is understood in the way the word is used by OTMA's counsel. By his definition, even this lawsuit is a terrorist act. Exhibit J, p. 3, second full paragraph. But if terrorism is taken in its usual sense, "the use of violence and intimidation in the pursuit of political aims,"[3] the fear is—to put it as gently as possible—speculative and conjectural. There is no history of violence associated with UnitedCoR's advertising campaign.   The opponents to UnitedCoR's viewpoint are primarily believers in some form of deity or another.   The fear of terrorism is utterly without foundation. There is no rational basis to fear that believers would throw a Molotov cocktail at a bus because they find the message that one can be good without God so intolerable as to drive them to murder.

---

[3] Dictionary.google.com, s.v. "terrorism"

The disclosures show that CATA exercises substantially more control than a simple final approval.   Wineland regularly was intimately involved in the decisionmaking process long before the final decision was made, both in this case and many others.

OTMA's regular contract with its advertisers provides that, "In instances where damage to advertising graphics is due to a third party, [OTMA]'s agent will assume responsibility for repair of said graphics." (Exhibit A, p. 3, paragraph 4).   There is no provision in either the standard Advertising Lease Contract or the contract between OTMA and CATA that would make CATA responsible for damage to CATA's property.   The contract between CATA and OTMA likewise provides that OTMA will be responsible for any damage to the "copy, displays, graphics, data or advertising."   Exhibit K, paragraph 4.

It is also notable that the contract refers to OTMA as Leasor's agent.

The contract simply does not rent all advertising space exclusively to OTMA.   The "Demised Space" is described as "Entire exterior of a bus or buses, exterior or interior display panels."   Exhibit D, paragraph 1.   The advertiser will pay the Authority "fifty percent (50%) of the net rental charge for the Demised Space, Payable within 30 days of the commencement of the rental agreement(s)."   Exhibit D, paragraph 2.

Emails prove that the authority makes money when advertising space is sold.   Exhibit A, p. 25. It is therefore implausible that OTMA could simply leave the space blank at its whim, as suggested by its counsel.

The evidence shows that contrary to OTMA's protestations, CATA was involved in the decision to reject UnitedCoR's advertisement.   The  evidence shows that the decision was based on Wineland's unwillingness to run an advertisement that questioned the existence of God.   The

22

Court should disregard as a sham any suggestion that the decision to turn down UnitedCoR's advertisement was simply the business decision of a private entrepreneur.

**VIII. Plaintiff stands ready to purchase advertising on the same basis that it is provided to others.**

Even though OTMA and CATA have, through stringing out the negotiation process, successfully prevented UnitedCoR from running its advertisement during Riverfest, UnitedCoR is still ready to pay the same amount that every other advertiser pays to rent space on the buses on the same terms as every other advertiser, without discrimination on the basis of the message.

**IX.    The court should grant a preliminary injunction directing defendant CATA to provide access to the plaintiff at the reasonable and customary rates and without any conditions that are not imposed on every other purchaser of advertising.**

Plaintiff requests a hearing at the Court's earliest convenience.   The evidence submitted with this motion shows that UnitedCoR is entitled to a preliminary injunction.   The evidence shows a high likelihood of success on the merits.   Defendants' actions impact UnitedCoR's freedom of expression.   The balance of harm analysis clearly favors UnitedCoR.   Granting of UnitedCoR's motion would be in the public interest.   The *Dataphase* elements are met here.   A preliminary injunction is necessary to protect UnitedCoR's freedom of expression and its right not to suffer discrimination on the basis of its message.

Respectfully submitted

J.G. "Gerry" Schulze
Attorney at Law
Ark Bar No. 83156

Attorneys for the Plaintiff:

23

J.G. Schulze
Baker Schulze & Murphy
11219 Financial Center Parkway, Suite 315
Little Rock, Arkansas 72211
Telephone: (501) 537-1000
Fax: (501) 246-8550
E-Mail: gschulze@b-s-m-law.com

William Burgess
American Humanist Association
1777 T Street, N.W.
Washington, D.C. 20009
Telephone: (202) 238-9088
Fax: (202) 238-9003
E-Mail: bburgess@americanhumanist.org
(pro hac vice motion pending)