**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED COALITION OF REASON, INC. | * | |
| | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| V. | * | NO: 4:11CV00450 SWW |
| | * | |
| CENTRAL ARKANSAS TRANSIT | * | |
| AUTHORITY and ONE THE MOVE | * | |
| ADVERTISING, INC. | * | |
| | * | |
| Defendants | * | |

## ORDER

The United Coalition of Reason, Inc. ("UCOR") commenced this action under 42 U.S.C. § 1983 against the Central Arkansas Transit Authority ("CATA") and On the Move Advertising, Inc. ("OTMA"), claiming that defendants violated UCOR's right to free speech by refusing to lease it advertising space located on CATA buses.  Along with the complaint, UCOR filed a motion for a preliminary injunction that would require the defendants  to permit UCOR to lease advertising space on the same terms available to others.  After a hearing held August 11, 2011, the Court granted UCOR's motion for a preliminary injunction.  This order augments and reaffirms the findings of fact and conclusions of law made from the bench.[1]

---

[1]A party is not required to prove his case in full at the preliminary injunction stage, and the findings of fact and conclusions of law made by the Court are not  binding on the trier of fact. *See Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995)(citing *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981)).

# I. Background

Plaintiff UCOR is a nonprofit corporation, with a mission to help local nontheistic groups achieve higher visibility and gain more members.   Defendant CATA is a public corporation empowered by statute to provide bus service to Pulaski County, Arkansas, *see* Ark. Code Ann. § 14-334-104, and defendant OTMA is a private corporation.

Pursuant to a written agreement between CATA and OTMA, OTMA sells or leases advertising space located on CATA buses.   Defendants contend that OTMA leases advertising space from CATA and then, acting as an independent contractor, subleases the ad space to advertisers.

A "Space Rental Agreement" between the defendants provides that "the Authority [CATA] and the Advertiser [OTMA] agree to and hereby lease, let, rent, take and hire from [CATA] the following described 'Demised Space':  Entire exterior of a bus or buses, exterior or interior display panels."  Plf's Hr'g Ex. D.  The agreement does not specifically state that OTMA will sublease the "demised" space, but it does provide that OTMA will  pay CATA fifty percent of the  "net rental charge" within 30 days of the commencement of rental agreements. *See id.*

The defendants' agreement provides that CATA reserves the right to "approve all copy, displays, graphics, data, and advertising" that OTMA proposes to locate on the buses "prior to the same being actually affixed, situated or placed" on the buses. *Id.*  The agreement further provides that  OTMA will be solely responsible for the repair and maintenance of "copy, displays, graphics, data or advertising" placed on CATA buses and that all risk of loss, damage, theft or destruction to the same will be borne by OTMA. *Id.*

OTMA sells ad space located on CATA buses using a standard form contract titled "Advertising Lease Contract" that identifies OTMA as the agent for CATA and refers to CATA as "Leasor." *See* Plf's Hr'g Ex. A at 2. The form provides that CATA reserves the right to approve all copy, displays, graphics, data, and advertising proposed by the advertiser. The form also states that the contract is "a mere sublease" by OTMA, and that the advertiser's rights are conditioned upon prior written consent by CATA. *Id.*

On February 28, 2011, Shaun Barbeau, a media broker, notified Lydia Robertson, the president of OTMA, that UCOR wanted to display an advertisement on CATA buses before and during Riverfest, an event held annually in Little Rock and North Little Rock during the Memorial Day weekend. *See* Plf.'s Hr'g Ex. A, at 46. Barbeau's email included UCOR's proposed ad copy, which depicts a background of blue sky and white clouds with text reading: Are you good without God? Millions are." The proposed ad also provides the website address of a local group affiliated UCOR.

Betty Wineland, CATA's executive director, testified that Robertson forwarded Barbeau's message and UCOR's proposed ad copy to her on February 28, 2011. Wineland recalled that she had concerns about the proposed ad, that it might create negative publicity for CATA, and she wanted time to review it and talk to counsel. According to Wineland, the same day she received UCOR's proposed ad, she approved the "artwork" and "reminded" Robertson that OTMA would be responsible for any damage "that related to" the advertisement. The record is void of written documentation showing that Wineland approved UCOR's proposed ad.

The following series of email communications took place after Barbeau's email message to Robertson on February 28, 2011:

- On February 28, 2011 at 2:04 p.m.,  Robertson forwarded Barbeau's email message and UCOR's proposed ad copy to Wineland.  Robertson's message to Wineland reads:   "Dear God . . . . HELP!"  Plf.'s Hr'g Ex. A at 45-46.

- On February 28, 2011 at 2:23 p.m., Wineland  responded to Robertson as follows: "I need him now more than ever.  Good grief.  I think we need to throw religion into the advertising policy–as a negative.  Stall While CATA reviews." Plf.'s Hr'g Ex. A at 45.

- On March 1, 2011 at 9:18 a.m, Robertson wrote Wineland:   "Just so you know, the Christian Science Church of North Little Rock had called for avails at the same time because they have a 'fabulous' speaker coming in late May.  (Makes me wonder if it's the same, or an opposing message that would help balance the other message?)  I tried calling her back and have had no call."   Plf.'s Hr'g Ex. A at 45-46.

- On March 1, 2011 at 12:04 p.m., Robertson wrote Barbeau, stating in part:

  Shaun, the transit authority will accept the artwork, but there are caveats.  Because [OTMA] is responsible for any damage/vandalism done to the buses or signage due to its message, we are placing this order in a special category.

  The Transit Authorities around the country do share ideas and experience and this campaign has caused some repercussions and vandalism in other markets.

  Please know that we only make money if we make money for [CATA], so I don't want to do anything to discourage the order.  However, in reality, Arkansas is the buckle of the Bible Belt and I can easily envision zealots or upstanding citizens with a strong faith acting out.  I cannot and will not accept this additional liability.

  Therefore, depending on the size order you place, we will require a refundable security deposit in advance–I prefer a cashier's check so we don't have to deposit it.  . . . .

  Let me know how many signs you're thinking, at this time, I believe we have 16 Kings available for you planned run date, but it is a first come-first signed policy.

Plf.'s Hr'g  Ex. A at 51.

- On March 1, 2011 at 1:15 p.m, in a message to Robertson, Wineland wrote:

4

"Thanks, Lydia."  Plf.'s Hr'g Ex. A at 51.  The message history attached to Wineland's message includes Robertson's message to Barbeau, informing him that UCOR would be required to pay a security deposit.

• On March 3, 2011 at 12:50 p.m.,  Barbeau wrote Robertson, stating that he was checking with his client regarding "the rather unorthodox request" for a security deposit, and he asked whether OTMA had required such of any other client.  Barbeau also asked Robertson to provide per panel production costs.  Plf.'s Hr'g Ex. A at 53.

• On March 3, 2011 at 5:56 p.m., Robertson responded to Barbeau, stating that she had never before required a security deposit.  Plf.'s Hr'g Ex. A at 52.   Robertson's message also states that production costs were approximately $100 per panel.

• On March 8, 2011 at 11:01 a.m., OTMA employee Ashley Foshee sent Wineland a message with the subject line: "Coalition for Reason Vandalism" and attachments titled:  "Coalition of Reason Vandalism Acts.docx."  The body of Foshee's message reads:   "Here are a few websites I found about vandalism.  The doc attached is a file of pictures and descriptions.  Hope this helps.  Let me know if you need me to keep digging!  Plf.'s Ex. A at 56.

• On March 8, 2011 at 11:35 a.m., Robertson sent Wineland the following message: "Betty, I hope you read in my careful email"  Plf.'s Ex. A at 57.

• On March 9, 2011 at 10:51 a.m., Robertson sent Barbeau the following message:

After much research and investigation into the Coalition for Reason's current and past advertising history, *both Central Arkansas Transit Authority and On the Move Advertising, Inc.* have decided to decline the schedule offer.  Thank you for your consideration of our market.

Plf.'s Hr'g Ex. A at 61 (emphasis added).

• On March 9, 2011 at 11:31 a.m., Barbeau responded to Robertson, stating:

This is very frustrating to say the least.  I specifically sent you the ad copy prior to getting rates so that we were clear up front–on if UCOR would be able to secure space.  You give us the authorization to move forward with the caveat of a security deposit, now after we have gone through the entire process and I have a signed IO you send the e-mail below?

Plf's Hr'g Ex. A at 60-61.  Barbeau also included information he had obtained from UCOR's director–that vandalism had occurred in only four of thirty-two markets where UCOR displayed ads and that only one instance of vandalism caused damage to the

vendor's property, a billboard.   *See id.*

- On March 9, 2011 at 12:55 p.m., Foshee sent Wineland a web link to an article posted on the American Humanist website. Foshee wrote: "Lydia thought this article was interesting.  The last guy on the list is Todd, and he's involved in MANY different groups."  Plf's Hr'g Ex. A at 58.

- On March 9, 2011 at 3:51 p.m., Bill Burgess, an attorney for UCOR, wrote Robertson, with a "Cc" to Wineland, stating that CATA's refusal to run UCOR's ad amounts to unconstitutional viewpoint discrimination in violation of the First Amendment.  Plf.'s Hr'g Ex. A at 54.

- On March 9, 2011 at 3:39 p.m., Foshee wrote Wineland:

  > I know that yesterday your  email wasn't working, and I'm unsure if it's working today.  See the following email from Shaun about declining his advertising campaign.

  > Recently, I had a phone call from Bill Burgess.  He gave me his phone number and I Googled it.  It said on the website for the American Humanist Association that Bill Burgess is the Legal Coordinator.  He called this afternoon and was asking for Lydia (whom, of course is in Houston).

  > Please email or call me back as to what to say to them, if anything at all.  Or is this something that you're going to let your attorney take care of.

Plf's Hr'g Ex, A at 60.

- On March 9,  2011 at 4:07 p.m., Wineland wrote Foshee: "We're turning this over to our legal counsel, Ashley, so just sit tight.  Thanks."  Plf's Hr'g Ex, A at 60.

- On March 9, 2011 at 4:51 p.m., Wineland sent Foshee an email message with a subject line reading: FW: Coalition of Reason's CAT advertisement.  The body of the message reads:

  > Ashley, while Lydia is out of town will you please check on the last time we accepted political ads.  Also give me the dates on the contracts for Geyer Springs Baptist and the Church of Christian Science–not sure of the exact name of the latter.

Plf's Hr'g Ex. A at 63.

- On March 10 at 12:18 a.m., Robertson sent Wineland a message with the subject line: "Coalition–Let on the Move take heat!"   The message states in part:

  > I never accepted an order . . . . The attorney's information is wrong–and he does NOT have a contract, verbal or otherwise. They have never agreed to the deposit I requested . . .  Actually, [Barbeau] wrote me back and said the most they would pay is $10,000.  The "vandalism" deposit was strictly requested from [OTMA] to cover the vandalism HE mentioned.  It would cost about $2,000 per side if a CATA bus ad had to be repainted . . . 18 signs times $2000 comes to $36,000.  That is where MY last email lies, other than refusing the order. . . .

Plf.'s Hr'g Ex. A at 53.    Robertson also sought Wineland's approval to send a response to UCOR's attorney, Bill Burgess.  Her message to Wineland reads:

  > Below is the note I would like to send.  It is strictly from On the Move and in previous emails, I've written every word with an eye toward the very position they have taken.  I am extremely conscious regarding the First Amendment and covering everyone while I do it. . . . Why not let me take the heat for awhile: Leave CATA out of it.  CATA can say On the Move responded on our own.   See what Carolyn [CATA's attorney] thinks about the brief not below.

*Id*.

- On March 10, 2011 at 8:59 a.m.,  Foshee wrote Wineland:

  > This Coalition of Reason REALLY has me thinking!  And I hope I'm not over stepping my boundaries.  Please let me know if I am.
  >
  > Maybe we should let them run their signs.  We've told them in several emails that if there is vandalism to the buses, their signs will be taken down, and their entire balance is due immediately.  If we have, let's just say, 10 complaints in the span of 2 weeks, then the signs will all come down, and their money will be refunded.  That way, we all win. They get to run the ads they want, and we get their money.  Honestly, the likelihood of their signs NOT being vandalized is like one to six billion.  Just something to think about.  That way, we avoid getting sued.  And by the way, they did agree to those terms, IN WRITING!

Plf's Hr'g Ex. A at 64.

During the preliminary injunction hearing, Wineland testified that each of the foregoing

7

email communications came to her email address, including messages that do not contain her address in the message header.

UCOR commenced this lawsuit on June 1, 2011, charging that the defendants refused to lease it advertising space on CATA buses on the same terms available to others in violation of the First Amendment.  UCOR seeks preliminary injunctive relief, requiring the defendants to contract with UCOR for the lease of advertising space on the same reasonable terms and at the same prices available to all other advertisers.

## II.  Discussion

In determining whether to issue a preliminary injunction, the Court must consider four factors: (1) the threat of immediate irreparable harm to the movant; (2) the balance between this harm and the injury that granting the injunction will inflict on other litigants; (3) the probability that movant will succeed on the merits; and (4) the public interest.  *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981).

The Court begins with an assessment of likelihood of success on the merits because it is well-settled that when the freedom of speech is the constitutional right at issue, the likelihood of success on the merits is the pivotal factor.  A loss of First Amendment freedoms, even for short periods of time, unquestionably constitutes irreparable injury.  *See Phelps-Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir. 2008)(quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673(1976)).  Accordingly, if a plaintiff establishes a sufficient likelihood of success on the merits on a First Amendment claim, he or she also establishes irreparable harm as the result of the deprivation. *Id.* (citing *Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir.1996)).  The determination of the public interest is also dependent on the likelihood of success on the merits

in a First Amendment case because it is always in the public interest to protect constitutional rights. *Id*. "The balance of equities, too, generally favors the constitutionally-protected freedom of expression." *Id*.

To show a likelihood of success on the merits, a movant need not show "a greater than fifty percent likelihood that he will prevail on the merits." *Dataphase*, 640 F.2d at 113. Instead, the question is whether the movant has a "fair chance of prevailing." *Phelps-Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007)(quoting *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003)).

To prevail with a claim under 42 U.S.C. § 1983, a plaintiff must show (1) that the challenged conduct was attributable to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States.

### Color of State Law

The First Amendment prohibits government from abridging the freedom of speech; it does not prohibit a private entity's restriction of speech. UCOR claims that CATA and OTMA acted together to deny UCOR's right to free speech and that OTMA's actions are fairly attributable to the state. Without question, CATA is a state actor subject to liability under § 1983.[2] However, the defendants claim that CATA played no part in the negotiations between OTMA and UCOR, "other than to state that the advertisements were acceptable." Docket entry #31, at 6. Defendants maintain that OTMA is an independent contractor, and its actions as a

---

[2]CATA is a public corporation, and exercise of its powers constitute public, governmental functions. *See* Ark. Code Ann. § 14-334-104.

private entity are not attributable to CATA.

To determine whether the conduct at issue is fairly attributable to the state, the Court must consider two issues: (1) whether the claimed deprivation resulted from the exercise of a right or privilege having its source in state authority and (2) whether the party engaging in the deprivation may be appropriately characterized as a state actor.  *See Wickersham v. City of Columbia*, 481 F.3d 591, 597 (8th Cir. 2007)(quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939, 102 S.Ct. 2744 (1982)).

The Court finds that the First Amendment deprivation claimed by UCOR resulted from the exercise of CATA's statutory authority to operate a public transit system and the authority granted to OTMA, by CATA, to assist in selling advertising space on CATA buses.  The important issue is whether, under the facts presented, OTMA may be appropriately characterized as a state actor.

A number of circumstances exist in which a private party may qualify as a state actor including but not limited to (1) where a private actor is a willful participant in joint action with the State or its agents and (2) where there is "pervasive entwinement" between the private entity and the state.  *See Wickersham*, 481 F.3d at 597 (citing *Brentwood Academy v. Tennessee Secondary School Auth. Ass'n*, 531 U.S. 288, 291, 121 S. Ct. 924 (2001) and *Mershon v. Beasley*, 994 F.2d 449, 451 (8th Cir. 1993)).  "'Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance.'"  *Id.* (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856 (1961)).

"The one unyielding requirement is that there be a 'close nexus' not merely between the

state and the private party, but between the state and the alleged deprivation itself." *Id*. (citing *Brentwood*, 531 U.S. at 295, 121 S. Ct. 924)). "No such nexus exists where a private party acts with the mere approval or acquiescence of the state, but a private entity may be considered a state actor if it 'has acted together with or has obtained significant aid from state officials in furtherance of the challenged action.'" *Id*. (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004-05, 102 S.Ct. 2777 (1982) and quoting *Lugar*, 457 U.S. at 937, 102 S.Ct. 2744)).

Here, the evidence presented demonstrates that UCOR is likely to prevail with its claim that OTMA's actions are fairly attributable to the state.   CATA contends that it had no role in denying UCOR's application for ad space and that Wineland approved UCOR's ad the very day it was submitted.   However, a reasonable factfinder could conclude that Wineland actually refused UCOR's application.

Wineland received a copy of Robertson's email message to Barbeau, which specifically states that "both" CATA and OTMA declined UCOR's offer.   Additionally, UCOR presents evidence indicating that OTMA operates as a mere conduit for CATA's decisions:  OTMA presents ads to CATA, CATA accepts or rejects ads based on the content of the ad, and OTMA communicates CATA's decision to applicants.  For example, in January 2011, PETA requested to run ad featuring a scantily clad nurse, urging viewers to "go vegan."   Robertson asked Wineland whether she would accept the graphics, and Wineland replied:  "Try saying 'No,' Lydia.  Too suggestive in my opinion."   Plf.'s Hr'g Ex. A at 10-11.  Also in January 2011, Wineland rejected a "female condom" ad that she considered controversial, telling Robertson: "If they plan to sue, we'll have to acquiesce, but I want to run it by our legal counsel before I give it.  I don't like what this will do to our already tarnished image.  I'll get back to you."

Plf.'s Hr'g Ex. A at 16.

Finally, the series of email communications that followed UCOR's application for ad space show that Wineland  remained involved, behind the scenes, and that Robertson and Foshee sought her approval and guidance in dealing with UCOR.  Although the defendants insist that OTMA acted as an independent contractor, the written agreement between the defendants refer to OTMA as agent for CATA, and the defendants' conduct indicates that OTMA did not act independently in denying UCOR's application.

In sum, the Court finds that UCOR has presented strong evidence CATA refused UCOR's request for advertising space (whether by joint action with OTMA or by directing OTMA, as an agent of CATA, to refuse the ad) and that OTMA's conduct is fairly attributable to the state.

### *Constitutional Deprivation*

The Supreme Court has articulated a three-step test for determining whether a restriction of private speech on public property violates the First Amendment.  *See Cornelius v. NAACP Legal Def. & Educ. Fund Inc.*, 473 U.S. 788, 797, 105 S. Ct. 3429, 3446 (1985).  Applying that test to the present case, the Court must first determine whether the display of UCOR's proposed ad on CATA buses is protected speech.  *Id.*  Second, assuming that the ad is protected speech, the Court must conduct a forum analysis as to the public property in question to determine the standard of review.  *Id.*  Third, the Court must determine whether the decision to deny UCOR's application comports with the applicable standard.  *Id.*

Whether viewed as a religious ad or an ad expressing a secular viewpoint, UCOR's proposed ad is fully protected under the Free Speech Clause.  *See Capitol Square Review and*

*Advisory Bd. v. Pinette,* 515 U.S. 753, 760, 115 S. Ct. 2440, 2446 (1995)(stating that private religious speech in a public forum is fully protected under the Free Speech Clause as secular private expression).

The permissibility of governmental restrictions on speech in public places generally depends on the character of the property at issue, and the Supreme Court has described three categories of public fora: (1) the traditional public forum; (2) the designated public forum; and (3) the nonpublic forum. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).  UCOR will likely prevail in showing that CATA buses constitute a designated public forum–that is, an area the government has intentionally opened for the exercise of some forms of First Amendment activity.  *See Bowman v. White*  444 F.3d 967, 975 (8th Cir. 2006)(quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677, 118 S.Ct. 1633 (1998)).   Although the government may impose reasonable restrictions on the time, place, and manner of protected speech in designated public forums, such restrictions must be justified without reference to the content of speech, be narrowly tailored to serve a significant government purpose, and leave open ample alternative channels for communication of the information.  *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S. Ct. 2746, 2753(1989)(citations omitted).

Here, Defendants claim that OTMA required a security deposit and ultimately refused UCOR's request for ad space out of concern that  UCOR's ad would rouse anger and cause vandalism.  Because the speech restriction in this case cannot be justified without reference to the content of UCOR's proposed ad, it amounts to a content-based speech restriction that is presumptively unconstitutional.  *See Perry Ed. Assn. v. Perry Local Educators' Assn*., 460 US

13

37 (1983) (stating that "a content-based prohibition [in a designated public forum] must be narrowly drawn to effectuate a compelling state interest").  Furthermore, the speech restriction in this case suppresses a nontheistic viewpoint, and CATA has permitted ads promoting churches and theism.[3]  If government allows speech on a certain subject, it must accept all viewpoints on the subject, including those that it disfavors or that are unpopular.  *Rosenberger v. Rector and Visitors of University of Virginia*,  515 U.S. 819, 829-830, 115 S.Ct. 2510 (1995).  "Viewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S.Ct. 2538 (1992); *Perry*, 460 U.S. at 46.

For the reasons stated, the Court finds that UCOR has met its burden to show a likelihood of success on the merits.  Accordingly, UCOR has also established irreparable harm as a result of the deprivation.  Furthermore, because it is always in the public interest to protect constitutional rights, the Court finds that the public interest would best be served by the issuance of a preliminary injunction.  Finally, the Court finds that the balance of equities lies in favor of protecting UCOR's First Amendment rights and favors an injunction.

Because a defendant who has been wrongfully enjoined has no recourse for damages in the absence of a bond, Rule 65(c) of the Federal Rules of Civil Procedure provides that a court may issue a preliminary injunction only if the movant gives security in an amount that the court finds proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.  *See W.R. Grace & Co. v. Local Union,* 759, 461 U.S. 757, 770 n. 14, 103

---

[3]UCOR presents evidence that CATA has accepted advertisements from churches, as well as political ads, public service messages, and commercial ads.  *See* Plf.'s Hr'g Ex. A, at 64-65, 79-80.

S.Ct. 2177 (1983).  The Court must consider the necessity of a bond in *any* case where a preliminary injunction is granted.

In light of the express language of Rule 65(c), the purpose of the bond requirement, and evidence presented at the preliminary injunction hearing that the display of UCOR's ad in other localities led to vandalism and the destruction of property, the Court finds that a security bond in the amount of $15,000 is appropriate.

### III.  Conclusion

For the reasons stated, Plaintiff's motion for a preliminary injunction (docket entry #2) is GRANTED.  Upon Plaintiff's posting of security bond in the amount of $15,000, Defendants shall permit Plaintiff to purchase advertising space available on CATA buses at the same rates and on the same terms available to others.

IT IS SO ORDERED THIS 16th DAY OF AUGUST, 2011.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE